CLARE E. CONNORS          7936
Attorney General of the State of Hawai'i

NICHOLAS M. MCLEAN        10676
EWAN C. RAYNER           10222
WILLIAM M. LEVINS        10295
CRAIG Y. IHA             7919
Deputy Attorneys General
Dept. of the Attorney General
425 Queen Street
Honolulu, Hawai'i 96813

Attorneys for Governor DAVID IGE,
in his official capacity; Attorney General
CLARE E. CONNORS, in her official
capacity; and the STATE OF HAWAI'I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| FOR OUR RIGHTS, et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>DAVID IGE, in his official capacity as Governor of the State of Hawai'i, CLARE E. CONNORS, in her official capacity as Attorney General for the State of Hawai'i, and STATE OF HAWAI'I,<br><br>      Defendants. | Case No. 1:20-cv-00268-DKW-RT<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; DECLARATION OF NICHOLAS M. MCLEAN; DECLARATION OF SARAH Y. PARK, M.D.; DECLARATION OF STEVEN HANKINS, M.D.; EXHIBITS "A"- "L"; CERTIFICATE OF SERVICE**<br><br>District Judge: Hon. Derrick K. Watson<br><br>Magistrate Judge: Hon. Rom Trader<br><br>Hearing: June 26, 2020 at 10:30 AM |

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................. 1

II.   BACKGROUND .............................................................................. 3

      A.    The COVID-19 virus ........................................................... 3

      B.    The State and counties issued incremental emergency orders
            to stem the spread of COVID-19 in Hawaiʻi ......................... 5

      C.    State and county emergency orders have succeeded in
            keeping the COVID-19 pandemic in check in Hawaiʻi ........... 7

      D.    As the State increases capacity to contain the spread of
            COVID-19, it begins to carefully lift emergency restrictions ............. 8

III.  PLAINTIFFS CANNOT MEET THE STANDARD FOR
      OBTAINING INJUNCTIVE RELIEF ............................................ 9

      A.    Plaintiffs are unlikely to succeed on the merits .................. 11

            1.    The emergency orders have a real and substantial
                  relation to protecting Hawaiʻi's people during the
                  COVID-19 pandemic ................................................. 11

            2.    Plaintiffs' claims fail even under ordinary right-to-
                  travel standards ........................................................ 13

            3.    Plaintiffs lack standing to assert their claims ........... 15

            4.    Plaintiffs' state law claims fail ................................ 17

                  i.    Plaintiffs' state law claims are barred by the
                        Eleventh Amendment ...................................... 18

                  ii.   Plaintiffs' state law claims fail on their merits ............. 19

      B.    Plaintiffs cannot establish irreparable harm ....................... 23

      C.    Granting an injunction would not be in the public interest,
            nor does the balance of harms favor plaintiffs ................... 25

IV.   CONCLUSION .............................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ............................................................... 24

*Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) ......................................................... 23, 24

*Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*,
   941 F.3d 1195 (9th Cir. 2019) ............................................................... 20

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ....................................................................... 13, 14

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ................................................................. 16

*Davis v. Burke*,
   179 U.S. 399 (1900) .............................................................................. 23

*De-Occupy Honolulu v. City & Cty. of Honolulu*,
   No. 12-00668 JMS, 2013 WL 2284942 (D. Haw. May 21, 2013) ................... 22

*Dines v. Pacific Ins. Co., Ltd.*,
   78 Hawai'i 325, 893 P.2d 176 (1995) .................................................. 22

*Doe v. Regents of the Univ. of California*,
   891 F.3d 1147 (9th Cir. 2018) ............................................................... 18

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ................................................................. 10

*Edwards v. California*,
   314 U.S. 160 (1941) .............................................................................. 13

*Elim Romanian Pentecostal Church v. Pritzker*,
   No. 20-1811, 2020 WL 3249062 (7th Cir. June 16, 2020) ..................... 5

*Fournerat v. Veterans Administration*,
   No. EDCV 19-0961 AB (AS), 2019 WL 8810110 (C.D. Cal. Dec. 19, 2019) ... 14

*Friends of Santa Clara River v. United States Army Corps of Engineers*,
  887 F.3d 906 (9th Cir. 2018) .............................................................. 16

*Gish v. Newsom*,
  No. DCV20755JGBKKX, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ......... 15

*Hammler v. Clark*,
  No. 1:19-cv-00373-AWI-SAB (PC), 2020 WL 1182515
  (E.D. Cal. Mar. 12, 2020) .................................................................. 10

*Hammler v. Clark*,
  No. 1:19-cv-00373-AWI-SAB(PC), 2019 WL 8219737
  (E.D. Cal. Dec. 30, 2019) ................................................................... 10

*Haynie v. Harris*,
  No. C 10-01255 SI, 2014 WL 899189 (N.D. Cal. Mar. 4, 2014) ..................... 24

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) ................................................................ 12

*In re Rutledge*,
  956 F.3d 1018 (8th Cir. 2020) .............................................................. 12

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ................................................................ 2, 11, 12

*Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*,
  423 F. Supp. 3d 947 (D. Haw. 2019) ...................................................... 10

*Kentucky v. Graham*,
  473 U.S. 159 (1985) .......................................................................... 18

*Lance v. Coffman*,
  549 U.S. 437 (2007) .......................................................................... 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 15, 17

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ................................................................ 23

*Nken v. Holder*,
  556 U.S. 418 (2009) .......................................................................... 10

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ................................................................. 18

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................ 10

*Qwest Corp. v. City of Surprise*,
    434 F.3d 1176 (9th Cir. 2006) ............................................ 20

*Raines v. Hawaii Dep't of Pub. Safety*,
    No. 16-00197 DKW/RLP, 2016 WL 3149581 (D. Haw. June 1, 2016) ............ 19

*S. Bay United Pentecostal Church v Newsom*,
    No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) .................. 12

*S. Bay United Pentecostal Church v. Newsom*,
    959 F.3d 938 (9th Cir. 2020) ............................................ 11

*Saenz v. Roe*,
    526 U.S. 489 (1999) ......................................................... 14

*Sanchez v. City of Fresno*,
    914 F. Supp. 2d 1079 (E.D. Cal. 2012) ................................ 14

*Save Sunset Beach Coal. v. City & Cty. of Honolulu*,
    102 Hawaiʻi 465, 78 P.3d 1 (2003) ..................................... 23

*Seki ex rel. Louie v. Hawaiʻi Gov't Employees Ass'n.*,
    133 Hawaiʻi 385, 328 P.3d 394 (2014) ................................ 21

*Southern Pac. Co. v. Arizona*,
    325 U.S. 761 (1945) ......................................................... 19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...................................................... 16

*State v. Cotton*,
    55 Haw. 138, 516 P.2d 709 (1973) ..................................... 19

*State v. Ewing*,
    81 Hawaiʻi 156, 914 P.2d 549 (App. 1996) .......................... 19

*State v. French*,
    77 Hawaiʻi 222, 883 P.2d 644 (App. 1994) ....................................................... 20

*State v. Shigematsu*,
    52 Haw. 604, 483 P.2d 997 (1971) ................................................................... 20

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ......................................................................... 10

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949) ............................................................................................ 12

*Tobe v. City of Santa Ana*,
    9 Cal.4th 1069, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (Cal. 1995) ...................... 14

*Univ. of Haw. Prof'l Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) ......................................................................... 25

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................................... 10, 23

*Wisconsin Legislature v. Palm*,
    2 N.W.2d 900 (Wisc. 2020) ............................................................................. 22

*Yu v. Queen's Med. Ctr.*,
    No. CV 19-00258 JMS-KJM, 2020 WL 355205 (D. Haw. Jan. 21, 2020)........ 25

**Statutes**

HRS § 127A-1(a) .................................................................................................. 22

HRS § 127A-1(c) .................................................................................................. 22

HRS § 127A-14(d).................................................................................................. 21

**Constitutional Provisions**

Haw. Const. art. 3 ................................................................................................. 22

Haw. Const. art. 5 ................................................................................................. 22

## DEFENDANTS' OPPOSITION TO
## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

## I.    INTRODUCTION

For the past several months, the State of Hawaiʻi has been grappling with an

unprecedented global public health emergency. COVID-19 is a highly infectious

and deadly disease that has already infected more than 2.1 million Americans—

and killed more than 116,000. To date, there is no vaccine or cure. As the virus

spread in parts of Asia, Europe, and the United States earlier this year, the

Governor and mayors issued incremental emergency orders in a measured response

to prevent the spread of COVID-19 in Hawaiʻi. The 14-day traveler self-quarantine,

stay-at-home, safer-at-home, and act-with-care orders have protected our

healthcare system from becoming overwhelmed by COVID-19 cases, as tragically

happened in Italy, New York, and other parts of the world. According to the public

health models guiding the State during this pandemic, the self-quarantine order for

travelers and other emergency orders prevented the more than 25,000

hospitalizations and 5,000 deaths projected for Hawaiʻi by July 23, 2020. Thanks

to these measures, and the dedication of the people of Hawaiʻi, this State currently

has one of the lowest COVID-19 infection and mortality rates in the country.

The people of Hawaiʻi have sacrificed much during these past months. In

recognition of this, the State is reopening the economy in a measured, thoughtful

way designed to keep COVID-19 infections within the State's healthcare capacity

and to avoid a larger "second wave" of infections in the fall. The risks to Hawai'i are particularly high given our State's geographic isolation: If the State's healthcare system is overwhelmed, emergency assistance may not be readily available, nor can patients easily travel to a neighboring state for treatment. With lives and livelihoods at stake, these are not easy decisions. That is why the lifting of the traveler self-quarantine requirements and other orders must be based on the best available health information, implemented upon careful consideration.

Enter Plaintiffs. Without any meaningful evidence, Plaintiffs ask this Court to upend efforts that have saved many lives, and potentially put at risk the collective work and shared sacrifices of the people of this State. In short, Plaintiffs' motion should be denied because they simply do not meet the highly demanding legal standard required for preliminary injunctive relief. Among other things:

- The emergency proclamations do not impermissibly infringe on Plaintiffs' constitutional rights. The emergency orders have a "real or substantial relation to the protection of the public health and public safety" and meet the deferential standard set forth in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The orders also do not directly impair Plaintiffs' right to travel.

- Plaintiffs lack standing to assert their claims. They do not allege concrete and particularized injuries of the kind that can be redressed by this Court.

- Plaintiffs' state law claims are unsupported. Their state law claims are barred by the Eleventh Amendment. And, in any event, the Governor has authority under both the Hawai'i Constitution and chapter 127A, Hawai'i Revised Statutes, to issue emergency orders.

- Plaintiffs allege no imminent threat of irreparable harm, much less present evidence that an injunction is necessary to prevent it.

- The public interest does not support granting the relief sought by Plaintiffs. On the contrary: Invalidating the emergency orders will significantly increase risk of greater and unmanageable COVID-19 infections in the State.

Therefore, as discussed below, this Court should deny Plaintiffs' motion.

## II.   BACKGROUND

### A.   The COVID-19 virus

The 2019 Novel Coronavirus ("**COVID-19**") is a respiratory illness caused by the coronavirus SARS-CoV-2. This virus was first identified in January 2020 in Wuhan, China and has since spread around the world. On January 31, 2020, the United States Department of Health and Human Services stated that COVID-19 was a nationwide public health emergency. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See* Declaration of Sarah Y. Park, M.D. at ¶¶ 6-7.

Worldwide there have been more than 8.2 million COVID-19 confirmed cases and 445,000 deaths. In the United States there have been more than 2.1 million confirmed cases and 116,000 deaths. As of June 18, 2020, there have been 762 confirmed COVID-19 cases and 17 deaths in Hawai'i. *Id.* at ¶¶ 8-9. The numbers are increasing each day.

COVID-19 spreads similarly to other viruses such as influenza. This can be by respiratory droplets expelled when an infected person breathes, coughs, sneezes, talks, or spits. It also can be spread by close personal contact such as shaking hands

or by touching a surface with the virus on it, then touching one's mouth, nose, or eyes. *Id.* at ¶ 10.

The virus can travel at least six feet through the air and survive on surfaces from hours to days depending on conditions. *Id.* at ¶ 11. COVID-19 has a maximum incubation period of up to 14 days.  A person may become infected and spread the virus to others at any point during that entire period without showing any symptoms. *Id.* at ¶ 12.

While many people experience only mild to moderate symptoms, those over the age of 65 or who have underlying health issues are at an increased risk for developing serious complications. These include pneumonia-like symptoms, which can lead to death. *Id.* at ¶ 13.

COVID-19 is much more severe than the seasonal flu. Our immune systems are familiar with seasonal flu, annual vaccines exist to offer some protection, and there are some effective drugs used to treat it. COVID-19, however, is completely novel to our immune systems, and there are no vaccines or treatments. *Id.* at ¶ 14. Because of our universal susceptibility, COVID-19 outbreaks have quickly overwhelmed healthcare systems around the world. *Id.* at ¶ 15.

Because there is no cure or vaccine at this time, the most effective way to minimize COVID-19 infections is by "physical distancing" and other behavior modifications. Proven effective methods include: (1) limiting the number of people

allowed to gather in one place (*i.e.*, decreasing the number of potential close

contacts); (2) keeping people at least six feet away from each other; (3) wearing

face coverings to protect others from one's respiratory droplets; (4) maximizing

cleaning to decrease the chance of a person touching an infected surface; and (5)

washing one's hands and refraining from touching one's face. *Id.* at 16. "Experts

think that, without controls, each infected person will infect two to three others,

causing an exponential growth in the number of cases. Because many of those

cases require intensive medical care, infections could overwhelm the medical

system." *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811, 2020 WL

3249062, at *1 (7th Cir. June 16, 2020).

      B.     The State and counties issued incremental emergency orders to stem
               the spread of COVID-19 in Hawai'i

As confirmed COVID-19 cases began to appear in the mainland United

States and Hawai'i, the Governor issued an Emergency Proclamation on March 4,

2020. This proclamation suspended certain State laws related to procurement and

other requirements to give State and county agencies greater operational flexibility

in preparing for COVID-19 spread in Hawai'i. Ex. A at pp. 4-7. The Governor

issued a Supplementary Proclamation on March 16, 2020, which suspended

additional state laws related to medical licensing, administrative deadlines, and

other requirements. Ex. B.

On March 21, 2020, the Governor issued a Second Supplementary Proclamation that established a 14-day self-quarantine for all travelers entering the State, effective on March 26, 2020. Ex. C at p. 1. This travel quarantine applied to residents and non-residents alike. *See id.* Consistent with measures deemed effective in other countries, the self-quarantine limits the interaction of people entering the State with others in the community. Park Dec. at ¶ 23. All persons are free to travel to Hawai'i; however, if they choose to do so, they must self-quarantine for the known incubation period of the disease. Ex. C at p. 1. Thus, if a person enters the State, self-quarantines for 14 days, and does not show any symptoms at the end of the period, it is extremely unlikely that person will still be infectious. Park Dec. at ¶ 20.

Before instituting the self-quarantine order, the State considered whether alternative methods, such as temperature screenings, could be effective. *Id.* at ¶ 24. Because a large portion of COVID-19 patients do not show symptoms, however, temperature screenings would fail to identify a large number of infected travelers. *Id.* Indeed, health guidance estimates that temperature checks and health questionnaires would fail to identify two thirds of infectious travelers. *Id.*; Ex. K.

Moreover, the act of traveling to Hawai'i in itself places people at a higher risk of COVID-19 infection. This is because air travel places travelers in close contact with one another and makes physical distancing difficult to achieve. Lines

at counters, security screening points, gates, and baggage claim areas all require people to congregate in tightly-packed groups. Park Dec. at ¶ 27.

By March 23, 2020, the virus spreading around the world had become established in Hawaiʻi, and community-based transmission was occurring. *Id.* at ¶ ¶ 16. In response, the Governor issued a Third Supplementary Proclamation restricting the operation of non-essential businesses, prohibiting gatherings of greater than 10 people, requiring people to stay at home with the exception of limited activities, and closing state parks and beaches. Ex. D at pp. 2-8. These restrictions were consistent with health guidance from the Centers for Disease Control and Prevention ("**CDC**"), which recommended physical distancing measures. Park Dec. at ¶ 16.

On March 31, 2020, the Governor issued a Fourth Supplementary Proclamation, extending the 14-day quarantine to interisland travelers. Ex. E at pp. 2-3. This measure further enforced physical distancing measures and was necessary to prevent the importation of COVID-19 cases from one island to another. Park Dec. at ¶ 17.

C.    State and county emergency orders have succeeded in keeping the
      COVID-19 pandemic in check in Hawaiʻi

Hawaiʻi currently has one of the lowest rates of infection and death from COVID-19 in the country. Without the travel self-quarantine and other public health measures, health officials estimate that more than 3,900 patients would be

expected to need hospitalization on July 17, 2020 alone. Declaration of Steven Hankins, M.D. at ¶ 7. This would have exceeded the State's hospital capacity beds by more than 2,000 beds. *See id.* at ¶ 10. The State's low numbers of infections and deaths are due in large part to the early physical distancing and self-quarantine measures put in place by the Third Supplementary Proclamation and county emergency orders. Park Dec. at ¶ 21.

> D.   As the State increases capacity to contain the spread of COVID-19, it begins to carefully lift emergency restrictions

As numbers of active COVID-19 cases have decreased and Hawaiʻi's capacity to contain outbreaks has improved, the State and counties have relaxed physical distancing and other measures. These include opening beaches; retail establishments; hair salons; and nearly every other activity other than those in a very high-risk category where physical distancing is impossible. *See, e.g.*, Ex. F at pp. 69-72; Ex. I.  Consistent with the positive health metrics, the 14-day self-quarantine requirement for inter-island travelers was lifted on June 16, 2020. *See* Ex. H at p. 9.

The State is not yet ready, however, to lift the self-quarantine requirement for out-of-state travelers. Hawaiʻi first must hit several benchmarks, including but not limited to: ensuring all businesses, schools, healthcare facilities are following safe practices; increasing its contact tracing capability; working to establish protocols for testing travelers prior to their arrival; ensuring a continuously stable

and adequate supply of testing supplies and personal protective equipment; and increasing the state's daily testing capacity. Park Dec. at ¶ 28. The State is also evaluating "travel corridors" with certain international and mainland locations that have low COVID-19 case levels. *Id.* The State has met some of these benchmarks, including increasing its contact tracing capability. However, it continues to work towards the other benchmarks. *Id.*

Hawai'i is appropriately acting with care and caution—especially as nineteen other states have seen a rise in new cases over the past week compared with the previous week, according to data from Johns Hopkins University. These states include Alaska (which recently lifted the very same 14-day self-quarantine order for travelers) as well as Arizona, Arkansas, Florida, Georgia, Kentucky, Michigan, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Utah, Vermont and Washington. *Id.* at ¶ 29. Moreover, as Hawai'i has moved through its reopening process, cases have begun to rise here as well. While the increase in cases is alarming, because of Hawai'i's deliberate and thoughtful approach, the State can continue reopening. This is in contrast to other states, some of which have had to slow or retract their reopening.

## III. PLAINTIFFS CANNOT MEET THE STANDARD FOR OBTAINING INJUNCTIVE RELIEF

"An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. NRDC*, 555 U.S. 7, 22, 32 (2008)). "A party seeking a . . . preliminary injunction simply cannot prevail when that motion is unsupported by evidence." *Hammler v. Clark*, No. 1:19-cv-00373-AWI-SAB(PC), 2019 WL 8219737, at *1 (E.D. Cal. Dec. 30, 2019).[1] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*, 423 F. Supp. 3d 947, 951 (D. Haw. 2019) (quoting *Winter*, 555 U.S. at 20). "When a party has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Id.* (quotation omitted).[2]

As discussed below, Plaintiffs cannot meet their burden regarding any of the four *Winter* factors.

---

[1] *Adopted*, 2020 WL 1182515 (E.D. Cal. Mar. 12, 2020).

[2] The last two *Winter* factors—the public interest and the balance of harms—generally "merge" when "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The government's interest *is* the public interest."). A showing on these factors by a movant is crucial—particularly when "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009).

A.   <u>Plaintiffs are unlikely to succeed on the merits</u>

1.   The emergency orders have a real and substantial relation to <u>protecting Hawaiʻi's people during the COVID-19 pandemic</u>

Plaintiffs' claims fail because they cannot show that the emergency orders have "*no real or substantial relation* to the protection of the public health and public safety," *Jacobson*, 197 U.S. at 31 (emphasis added). In *Jacobson*, the U.S. Supreme Court held that constitutional rights "may at times, under the pressure of great dangers" be restricted "as the safety of the general public may demand." 197 U.S. at 29. Vitally, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. When the government must protect its people during a pandemic, its actions do not violate the Constitution unless they are "arbitrary" or "unreasonable"—*i.e.*, whether the requirements have "no real or substantial relation to [their] objects, or [are], beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*. at 31.

The Ninth Circuit and other federal courts have applied or affirmed the application of *Jacobson* during the COVID-19 pandemic. As the Ninth Circuit recently observed, "[w]e're dealing here with a highly contagious and often fatal disease for which there presently is no known cure. In the words of Justice Robert Jackson, if a '[c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.'" *S.*

*Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020)

(quotation omitted). Concurring in the Supreme Court's decision that injunctive

relief was not appropriate in that same case, Chief Justice Roberts made clear that

*Jacobson* controls during the COVID-19 pandemic:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).
>     That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground.

*S. Bay United Pentecostal Church v Newsom*, No. 19A1044, 2020 WL 2813056, at

*1-2 (U.S. May 29, 2020) (Roberts, C.J., concurring).[3] Such is the case here.

---

[3] *See also In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) ("the district court's failure to apply the *Jacobson* framework produced a patently erroneous result."); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" (quoting *Jacobson*, 197 U.S. at 31)).

Here, it is indisputable that the COVID-19 pandemic is an extreme, unprecedented global health crisis. The State and county emergency measures discussed above were imposed directly in response to this crisis and are substantially related to protecting the health and safety of Hawai'i's people. Accordingly, the *Jacobson* standard is plainly met.

        2.    Plaintiffs' claims fail even under ordinary right-to-travel <u>standards</u>

Even if *Jacobson* did not apply, the self-quarantine requirement still would not violate Plaintiffs' constitutional right to interstate travel. As Plaintiffs recognize, the federal constitutional right to travel is implicated by "laws that *directly* impair the exercise of the right to free interstate movement." Complaint at ¶ 63 (quotation omitted). "The federal guarantee of interstate travel . . . protects interstate travelers against . . . 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276-77 (1993) (quotation omitted). The Governor's emergency proclamations do neither.

The Supreme Court has held that a statute that made criminal the entry of indigent persons into a state violated the right to travel. *Edwards v. California*, 314 U.S. 160, 168 (1941). But the Court has also held that a statute conditioning welfare benefits on a full year of residency in a state did *not* implicate the free-movement aspect of the right to travel because the statute did not actually create a

13

direct obstacle to entry into the state. *Saenz v. Roe*, 526 U.S. 489, 501 (1999).

Moreover, "a law having an incidental impact on travel of a law but having a

purpose other than restriction of the right to travel, and which does not

discriminate among classes of persons by penalizing the exercise by some of the

right to travel, is constitutionally permissible." *Sanchez v. City of Fresno*, 914 F.

Supp. 2d 1079, 1110 (E.D. Cal. 2012) (citing *Tobe v. City of Santa Ana*, 9 Cal.4th

1069, 1100, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (Cal. 1995)). Restrictions on a

person's freedom of *intra*state movement do not amount to a violation of the

federal constitutional right to *inter*state travel, *Bray*, 506 U.S. at 277, and—

crucially—"neither the Supreme Court nor the Ninth Circuit has recognized a right

to intrastate travel." *Fournerat v. Veterans Administration*, No. EDCV 19-0961

AB (AS), 2019 WL 8810110, at *5 (C.D. Cal. Dec. 19, 2019) (citing cases).

Here, the 14-day self-quarantine requirement does not impose a barrier to

entry to or departure from the State. People are free to leave and enter Hawaiʻi, and

to migrate here. Given the health crisis, however, they must self-quarantine for 14

days after arrival before it is safe for them to move around the State. This

requirement was put in place for one central reason—to ensure that those who do

travel to the State do not spread COVID-19. Because the disease does not

discriminate, neither does the policy: It applies to visitors as well as to returning

and intended residents.

Moreover, even if the self-quarantine requirement *did* impose a direct barrier to entry, it still would satisfy heightened constitutional scrutiny. Protecting Hawai'i's people from the further spread of COVID-19 and preventing the health care system from being overwhelmed are manifestly compelling state interests. As stated above, the emergency proclamations were intended to, and have in fact, saved lives. *See, e.g., Gish v. Newsom*, No. DCV20755JGBKKX, 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020) ("[S]lowing the spread of COVID-19" is a compelling state interest). The self-quarantine requirement is also narrowly tailored. It extends no longer than the virus's 14-day incubation period. Park Dec. at ¶ 20. Nor are alternative requirements alone such as testing or temperature screenings feasible or adequate at this time. *Id.* at 24.

3.   <u>Plaintiffs lack standing to assert their claims</u>

Plaintiffs' allegations lack the concrete and particularized injuries-in-fact necessary to establish Article III standing. "A plaintiff seeking relief in federal court must establish the three elements that constitute the 'irreducible constitutional minimum' of Article III standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), namely, that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906, 918 (9th Cir. 2018).

15

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quotation omitted). On the other hand, "a generalized grievance that is plainly undifferentiated and common to all members of the public," *Lance v. Coffman*, 549 U.S. 437, 440-41 (2007) (quotations omitted), will not support standing. Moreover, "[f]or injunctive relief, which is a prospective remedy . . . the threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quotation omitted); *id.* ("past wrongs" are "insufficient by themselves to grant standing" for prospective injunctive relief).

Plaintiffs here do not even attempt to establish any "certainly impending" threatened injury regarding their right to travel claims. None of the Plaintiffs have alleged any concrete future plans. Vague and hyperbolic statements—such as "I want to travel and see family on the other islands and the mainland, but if the travel restrictions are not lifted, I will be subjected to torture if I want to see my family"—are not sufficient. Indeed, these allegations are the same type the Supreme Court rejected in the foundational *Lujan* case:

> [T]he affiants' profession of an 'intent' to return to the places they had visited before—where they will presumably, this time, be deprived of the

> opportunity to observe animals of the endangered species—is simply not enough. Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.

*Lujan*, 504 U.S. at 564.

Plaintiffs also cannot manufacture standing by claiming financial harm to their businesses resulting from the 14-day quarantine requirement because their allegations are too attenuated from the alleged constitutional violation to constitute an "injury in fact." These claims do not involve any direct interference with Plaintiffs' own constitutional rights to travel. Rather, they allege indirect harm resulting from the alleged violation of *others'* constitutional rights. But "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. That is because there are inherent causation and redressability problems when a plaintiff's alleged injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.*

    4.    <u>Plaintiffs' state law claims fail</u>

i.   Plaintiffs' state law claims are barred by the Eleventh
Amendment

Because Plaintiffs' state law claims[4] are barred by the Eleventh Amendment, the Court may not reach the merits of those claims and so Plaintiffs cannot establish *any* showing on the merits with respect to those claims. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) ("a claim that state officials violated state law . . . is a claim against the State that is protected by the Eleventh Amendment," as are "state-law claims brought into federal court under pendent jurisdiction"). "[T]he [*Ex parte*] *Young* exception does not apply when a suit seeks relief under state law, even if the plaintiff names an individual state official rather than a state instrumentality as the defendant." *Doe v. Regents of the Univ. of California*, 891 F.3d 1147, 1153 (9th Cir. 2018). The Eleventh Amendment also bars Plaintiffs' claims against the State itself.[5]

---

[4] *See* Mot. at 5-6 (arguing that the Emergency Proclamation violates the right to travel under the Hawaiʻi Constitution); *id*. at 10-13 (arguing that the Emergency Proclamation is unconstitutional under the Hawaiʻi Constitution and contravenes HRS Chapter 127A); Complaint at ¶¶ 8, 60, 62 (aspects of Count I focusing on State constitution), 73-83 (Count II—alleging violations of the right to intrastate travel under the State Constitution); 84-89 (aspects of Count III focusing on intrastate travel); 90-101 (Count IV—alleging the Governor exceeded his delegated legislative authority under State law).

[5] "Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it . . . a State cannot be sued directly in its own name regardless of the relief sought." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). "Hawaiʻi has not waived its Eleventh Amendment immunity for § 1983 claims, and Congress did not intend § 1983 to abrogate a state's Eleventh Amendment

ii.   Plaintiffs' state law claims fail on their merits

Plaintiffs' state law claims fall into two categories: (1) an alleged violation of the right to travel under the Hawaiʻi Constitution; and (2) an alleged violation of HRS Chapter 127A which purportedly gives rise to a claim under the Hawaiʻi Constitution. Plaintiffs cannot establish a likelihood of success on either.

First, Plaintiffs' right-to-travel claim fails on the merits. As an initial matter, the settled principles in *Jacobson* apply to claims under the Hawaiʻi Constitution as well.[6] And even if the highly deferential *Jacobson* standard did not apply, Plaintiffs still could not establish a likelihood of success on their interstate-travel claim under State law for the same reason they cannot establish a likelihood of success on the federal constitutional interstate-travel claims. *See supra* Part III.A.2.

Nor can Plaintiffs prevail on an *intra*state right-to-travel claim[7] under the Hawaiʻi Constitution. The Hawaiʻi Supreme Court has suggested that "[f]reedom

---

immunity." *Raines v. Hawaii Dep't of Pub. Safety*, No. 16-00197 DKW/RLP, 2016 WL 3149581, at *4 (D. Haw. June 1, 2016).

[6] *Cf. State v. Cotton*, 55 Haw. 138, 142 n.3, 516 P.2d 709, 711 n.3 (1973) ("Highway regulation is akin to *quarantine measures*, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the state has exceptional scope for the exercise of its regulatory power." (quoting *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 783 (1945)) (emphasis added; cleaned up); *State v. Ewing*, 81 Hawaiʻi 156, 164, 914 P.2d 549, 557 (App. 1996) ("The police power of the State is broad and extends to the public safety, health, and welfare.").

[7] Intrastate travel claims are also moot because the interisland self-quarantine requirement was lifted on June 16, 2020. "[I]f a new law is enacted during the pendency of an appeal and resolves the parties' dispute, the case

would be incomplete if it does not include the right of men to move from place to place, to walk in the fields in the country or on the streets of a city, to stand under open sky in a public park and enjoy the fresh air, to lie down on a public beach and enjoy a sunbath, to visit a friend in his home and enjoy an evening together, and the right to associate with others in the enjoyment of an avocation or a vocation." *State v. Shigematsu*, 52 Haw. 604, 610, 483 P.2d 997, 1001 (1971). But this principle, as later Hawaiʻi cases clarify, "is subject to the State's police power to regulate an individual's conduct for the protection of society." *State v. French*, 77 Hawaiʻi 222, 231-32, 883 P.2d 644, 653-54 (App. 1994). The court in *French* held that because a state law imposed restrictions that were "rationally related" to the purposes underlying the police power, there was no violation of the freedom of movement. *Id.* The State was required to place limitations upon freedom of movement in response to a public health emergency. Plaintiffs cannot establish that they are likely to succeed on their right-to-travel claim under state law.

---

becomes moot for lack of a live case or controversy." *Qwest Corp. v. City of Surprise*, 434 F.3d 1176, 1181 (9th Cir. 2006). Then, the burden is on the plaintiff to provide evidence establishing a "reasonable expectation" that the challenged conduct is likely to recur. *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198-99 (9th Cir. 2019); *cf. id.* (controversy moot because "[t]here is no evidence in the record indicating a reasonable expectation that the [state] legislature is likely to enact the same or substantially similar legislation in the future").

Second, Plaintiffs' state separation-of-powers claim also fails. There has been no violation of HRS § 127A-14(d), which provides that "[a] state of emergency . . . shall terminate automatically sixty days after the issuance of a proclamation of a state of emergency." This provision helps to ensure that a particular emergency proclamation is associated with a particular, defined period of time. Contrary to Plaintiffs' suggestion, this does *not* mean the Governor is powerless to address an ongoing emergency by issuing a supplemental emergency proclamation that renews a state of emergency once 60 days have elapsed following a first emergency proclamation. Under Plaintiffs' reading, the Governor's hands would be tied, no matter how serious or long-lasting the emergency. That reading (and the chaos and uncertainty such a ruling would cause) cannot be what the Legislature intended. *Seki ex rel. Louie v. Hawaiʻi Gov't Employees Ass'n.*, 133 Hawaiʻi 385, 402, 328 P.3d 394, 411 (2014) (statutes read "in the context of the entire statute and . . . consistent with its purpose[.]" (quotation omitted)).

The purpose of HRS Chapter 127A was to grant to the Governor broad powers in emergency situations to respond to evolving and unpredictable conditions. This included "confer[ring] upon the governor . . . the emergency powers necessary to prepare for and respond to emergencies or disasters[.]" HRS § 127A-1(a)(2). Indeed, the Legislature expressly intended "to provide for and

confer *comprehensive powers*," and it directed that the laws in this area "shall be

*liberally construed* to effectuate [their] purposes[.]" HRS § 127A-1(c) (emphasis

added). Section 127A-14(d) cannot be read to "create[] an absurd or unjust result."

*Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai‘i 325, 337, 893 P.2d 176, 188 (1995).[8]

　　And even if HRS § 127A-14(d) had been violated (which it was not),

Plaintiffs would still lack a cause of action under the State Constitution. "Not all

pronouncements in the Hawaii constitution create a private right of action." *De-*

*Occupy Honolulu v. City & Cty. of Honolulu*, No. 12-00668 JMS, 2013 WL

2284942, at *10 (D. Haw. May 21, 2013). The two provisions of the Hawai‘i

Constitution cited by Plaintiffs—Article 3, Section 1[9] and Article V[10]—are not

self-executing. A provision is not "self-executing when," as here, "it merely

indicates principles, without laying down rules by means of which those principles

---

[8] Plaintiffs' reliance on *Wisconsin Legislature v. Palm*, 2 N.W.2d 900 (Wisc. 2020), is unavailing. There, a divided Wisconsin Supreme Court determined that Palm, the Secretary-designee of the State Department of Health Services, exceeded her authority in certain respects. The *Palm* court made clear that the governor's power to enact emergency proclamations was not before it. *Id*. at 914.

[9] *See* Haw. Const. art. 3, § 1 ("The legislative power of the State shall be vested in a legislature, which shall consist of two houses, a senate and a house of representatives. Such power shall extend to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States.").

[10] *See* Haw. Const. art. 5, § 1 ("[t]he executive power of the State shall be vested in a governor"); Haw. Const. art. 5, § 5 ("[t]he governor shall be responsible for the faithful execution of the laws" and "[t]he governor shall be commander in chief of the armed forces of the State and may call out such forces to execute the laws, suppress or prevent insurrection or lawless violence or repel invasion").

may be given the force of law." *Save Sunset Beach Coal. v. City & Cty. of Honolulu*, 102 Hawai'i 465, 475, 78 P.3d 1, 11 (2003) (quoting *Davis v. Burke*, 179 U.S. 399, 403 (1900)).

Moreover, each supplemental proclamation addresses the emergent factors anew and is based upon on a stand-alone assessment of changing public health data.

B.    Plaintiffs cannot establish irreparable harm

Plaintiffs cannot meet their burden to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs' first irreparable harm theory—that "deprivation of constitutional rights unquestionably constitutes irreparable injury," Mot. at 14, fails simply because they have not even established standing, let alone shown irreparable harm. In short, Plaintiffs have not alleged any *likely imminent* deprivation of their constitutional rights. Although "an alleged constitutional infringement will often alone constitute irreparable harm," *Monterey Mech. Co. v. Wilson,* 125 F.3d 702, 715 (9th Cir. 1997) (quotation omitted), a party seeking an injunction nevertheless must "demonstrate that it will be exposed to some *significant risk* of irreparable injury." *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991) (emphasis added). Moreover, irreparable harm cannot be presumed from an alleged constitutional violation unless the plaintiffs have shown a sufficient likelihood of success on the merits. *Id.* at 1412 ("While allegations of

constitutional infringement might be sufficient to presume irreparable harm, in this case, . . . the constitutional claim is too tenuous[.]" (quotation omitted)).

Plaintiffs' second theory—that "every Plaintiff and person in Hawaiʻi faces potential criminal arrest and prosecution under the May 18 Supplement," Mot. at 16—fails for similar reasons.[11] Even if any Plaintiff *had* alleged past enforcement actions related to provisions in the emergency orders—which they have not—they still would have to allege more to establish the requisite "imminent threat of irreparable harm." *Haynie v. Harris*, No. C 10-01255 SI, 2014 WL 899189, at *5 (N.D. Cal. Mar. 4, 2014) ("Haynie's single arrest is not sufficient to demonstrate a real and immediate threat because 'past exposure to illegal conduct' alone is not enough to meet the standard for injunctive relief. Moreover, his claim that he will have similar future encounters with law enforcement officers is pure speculation[.]") (quotation omitted); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) ("affidavits [that] are conclusory and without sufficient support in facts" do not establish irreparable harm). Plaintiffs allege only speculative and hypothetical fears of enforcement action. This does not establish irreparable harm.

---

[11] As noted above—*see supra* n.7—this claim is moot because the Governor's May 18 Supplement has been superseded by the Governor's Ninth Supplementary Emergency Proclamation.

C.   Granting an injunction would not be in the public interest, nor does the balance of harms favor plaintiffs

Plaintiffs also cannot satisfy the final two *Winter* factors—the public interest and the balance of harms. "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Plaintiffs' proposed injunction would increase the potential for COVID-19 transmission and create catastrophic risk to public health. Plaintiffs' motion should thus be denied because the relief sought "could harm the public interest." *Yu v. Queen's Med. Ctr.*, No. CV 19-00258 JMS-KJM, 2020 WL 355205, at *8 (D. Haw. Jan. 21, 2020).

IV.   **CONCLUSION**

For the reasons set forth herein, the Court should deny Plaintiffs' Motion.

DATED: Honolulu, Hawaiʻi, June 19, 2020.

 /s/ Nicholas M. McLean
NICHOLAS M. MCLEAN
EWAN C. RAYNER
WILLIAM M. LEVINS
CRAIG Y. IHA
Deputy Attorneys General

Attorneys for Governor DAVID IGE,
in his official capacity; Attorney General
CLARE E. CONNORS, in her official
capacity; and the STATE OF HAWAIʻI